It STEWART, J.
On December 13, 2001, John Hall filed a disputed claim for compensation against his employer, Buquet and Leblanc, Inc. (“Buquet”) in the Office of Workers’ Compensation (“OWC”) seeking benefits for a back injury he allegedly suffered at work. The parties stipulated that General Motors Corporation (“GM”) was Hall’s statutory employer and that Hall suffered a compen-sable injury to his knee. GM denied that Hall’s back injury was compensable. The matter was tried before the OWC which denied Hall’s claim for compensation benefits for his back injury. Hall now appeals. For the reasons discussed herein, we affirm.
FACTS
In 2001, John Hall was employed as a laborer for Buquet on a construction site at the GM plant in Shreveport. On October 16, 2001, Hall was working on a concrete foundation when he tripped over a shovel and fell. His right knee hit the concrete, his right shoulder hit a steel beam or post, and the shovel injured his left foot. In addition, he testified he was hurting “from [his] waist line.” He said:
Q: Tell me why were you holding your waist line. What’s the reason for that?
A: Well, I really couldn’t say because the pain was most inside of the knee, but I was broke. You know what I’m saying? I was broke down in the waist like. You know what I’m saying? I couldn’t walk. You know what I’m saying? I *1030 didn’t put myself — you know what I’m saying? I was kind of off balance like, you know.
However, Hall stated that his waist was not hurting as much as his knee. A foreman and Renee Hooks; another Bu-quet/GM employee, helped Hall into a buggy. Hooks testified that she took Hall’s shoe off and saw that he was |¡>injured. She also said that Hall complained of back pain to her. The employer’s injury report prepared on October 18, 2001, reflects only a knee injury, and Mr. Hall’s own report, which may not have been written by him, reflects a “contusion.”
The record reveals that Hall had a significant history of right knee trouble including a surgery in 1981. He had also injured his back several times, first in a 1977 accident. He was involved in a fight in 1995, and was hit in the upper back with a lead pipe and at the same time reinjured his knee. He also fell from a ladder in 1998 and injured his back and both knees. Finally, he pulled his back at his brother’s funeral in 1999, and was treated by a doctor for that pain. Despite these injuries, Hall’s medical records do not indicate that his back troubles persisted after any of these incidents. Moreover, he did not indicate that he ever had any prior knee or back injuries at all on a GM injury questionnaire form. In fact, Hall left the question about back injuries blank.
Following the accident, the foreman took Hall to the medical trailer for further medical attention. Hall said that he told Bill Kindon, the GM paramedic, about all of his injuries, including his back pain, and that Kindon put ice on the injured areas, including on Hall’s back. After 10 or 15 minutes, Kindon told Hall to go home but return to the medical trailer the next morning. Hall drove to his wife’s place of employment, and they went home together from there. He said he saw his neighbor, Mary Moffett, that evening and told her what had happened that day.
|aMs. Moffett testified that she saw Mr. Hall one day in October and that he was “limping and holding his back and couldn’t hardly walk” and related his injury to his fall at work. She specifically remembered hearing Hall complain of a back injury.
Hall said that the morning after his accident, he was unable to get out of bed by himself. However, with help, he was able to get into the car, and his wife drove him back to the medical trailer at GM. He again saw Kindon who, according to Hall, applied ice to the affected areas including his back. However, Kindon stated in his deposition that Hall did not make any complaints of pain in his back. Hall returned home and did not work that day. Hall related that either that day or the next, he almost fell when he went out into his back yard to try to feed his dog. Hall returned to see Kindon the next day and told him that he almost fell on the grass and that he felt “handicapped” when he was not on a hard surface. Kindon again said that Hall did not report any lower back difficulties. However, because Hall continued to have trouble with his right knee, Kindon referred him to a physician.
Another GM employee, Roderick Maho-ney, was in the medical trailer being treated during one of Hall’s visits. Mahoney testified that he overheard Hall tell Kin-don that he almost fell while feeding his dog. However, Mahoney was not sure of the date of this visit and admitted that his own recent claim for compensation against GM had been denied due to allegations of fraud.
|4On October 18, 2001, Hall saw Dr. Douglas Holman for treatment of his knee. After examining Hall, Dr. Holman released Hall to participate in as much regular activity as he could tolerate. Dr. Holman’s records from that date reflect no *1031 complaints of back pain, and Hall said that he did not tell the doctor about his back pain because, taking Kindon’s word for it, he thought the back pain was due to his knee and his foot injury. Hall said that he did relate on an unspecified date a pain in his pelvic area when he picked his feet up. Hall also alleged that Dr. Holman took most of his information from Bill Kindon instead of him, but that he believed that Kindon had been relating all of his complaints, including his complaint of pain around his pelvis, to Dr. Holman.
Radiology from October 19, 2001, revealed “no acute abnormality” in Hall’s right knee, but Hall complained that the injury did continue to hurt. Hall returned to see Bill Kindon at GM on October 22, 2001. When testifying concerning that visit, Kindon said:
Well he came in and basically said that on Saturday while he was in the back yard feeding his dog, his knee gave way. Stepped in a hole or something to that effect and his knee gave way making him fall, striking his back or his hip. Actually it started out his hip was hurting. He had pain in his hip.
Hall flatly denied that he told Kindon that he fell at home. However, Ms. Tammy Bailey, a safety supervisor with Gilbane, GM’s third party workers’ compensation administrator, testified that she was in the safety trailer with Hall and Kindon within a week of the accident at the work site, and Hall told her and Kindon that he had tripped and fallen at home with his dog. Wesley Wallace, a Gilbane safety manager, testified that Hall told him on | s October 22, 2001, that he had “tripped and fell inside of a dog pen while he was feeding his dog.” Hall denied having a conversation with either Ms. Bailey or Mr. Wesley about his back injury.
Hall said that his back really began to hurt on about the fourth day after the accident. Hall’s wife, Patricia, said that he began to complain of back pain on “about the third day” after the accident. She also said that she was with Hall during the incident when he almost fell while feeding the dog and that he did not actually fall.
Hall claimed that he relied on the assertions of Bill Kindon that his back pain was related to the knee pain and believed that Kindon was a doctor. On October 24, 2001, Hall saw Bill Kindon again and again complained of worsening lower back pain. Kindon called Dr. Holman and related Hall’s history to the doctor. Hall returned to see Dr. Holman on October 26, 2001. Dr. Holman’s records from that date reflect no complaints of back pain. The doctor injected Hall’s knee with lidocaine and'Kenalog and sent Hall home to rest over the weekend. On October 30, 2001, Hall returned to see Dr. Holman. Dr. Holman’s records reflect:
He originally had a knee injury which we treated conservatively and injected with Kenalog. The knee is somewhat better, however, he is now having pain in both hips and in his low back. He said he took a tumble at home this weekend because his knee gave way with him.
Dr. Holman could not recall exactly how Mr. Hall related this incident to him, but remembered that Bill Kindon had told him about it first and believed that Hall confirmed Kindon’s version of what happened. Radiology revealed a narrowing of the disc space at L5-S1 but no acute | fiabnormality. Dr. Holman limited Hall to light duty work. Hall continued to report to GM every day to clock in but never actually returned to work. He returned to see Dr. Holman on November 2, 2001, and November 7, 2001, with increasing complaints of lower back pain. On November 7, 2001, the date of Hall’s last visit, Dr. Holman observed that Hall’s knee injury was *1032 “much better, almost resolved” and injected his back with Depo-Medrol. Dr. Holman referred Hall to another doctor for his complaints of back pain, but Hall said he could not afford to see another doctor unless GM paid for the visit. GM refused to pay.
At his deposition, Dr. Holman said that the narrowing between discs observed in Hall’s back could be the result of an acute incident or could be the result of normal wear and tear. Dr. Holman also gave his opinion that Hall’s back symptoms were not related to his October 16, 2001, work accident given the passage of time between the accident and the first report of symptoms. He said that it was “possible” or “conceivable” that the back problems were related to the fall at work but that such a long time between injury and symptoms would be “very unusual.”
In November 2001, GM terminated Hall as a reduction in force, and Hall has not done any work since that time. In December 2001, Hall went to LSU Medical Center for an evaluation of his complaints of pain. A January 2002 MRI study revealed disc protrusion at L4-5 and disc extrusion at L5-S1. In May 2002, he saw an orthopedic surgeon, Dr. Edward Morgan, who recommended anti-inflammatory medication. Hall’s back pain continued, and he was evaluated by an orthopedic surgeon at LSU, Dr. Kalia |7Sadasivan. Dr. Sadasi-van related that Hall said that his back problems commenced after his fall at work, and the doctor concluded that the work accident caused the back injury based on this history, the physical, and the treatment plan. Dr. Sadasivan recommended surgery, and in July 2002, Hall underwent back surgery, specifically a laminectomy at L5 and discectomy at L5-S1, performed by Dr. Sadasivan and Dr. Timothy Talbert. Dr. Sadasivan reported that Hall made good progress after the surgery and that his complaints of pain subsided by his last visit in September 2002. Hall also said that his pain had been relieved by the surgery but that his back now felt “loose” all the time and he could no longer do heavy work. He also said that GM had not paid for any of the therapy related to his back.
The workers’ compensation judge found that Hall’s back injury was not caused by his October 16, 2001, work accident and denied his claim. The judge did not offer written reasons for this finding. This appeal ensued.
DISCUSSION
An injured employee is entitled to receive benefits for an injury that arises out of and in the course of his employment. La. R.S. 23:1031. The injured employee bears the initial burden of establishing the causal connection between the disability and the employment accident by a reasonable preponderance of the evidence. The claimant is not required to establish the exact cause of the disability, but the claimant must demonstrate by a preponderance of proof that the accident had a causal connection with the disability. Proof by a preponderance of the evidence exists when the evidence, taken as a whole, shows the facts sought to be proved are more ^probable than not. Thompson v. Dillard’s Department Store, 32,974 (La.App.2d Cir.5/10/00), 759 So.2d 1074.
The causal connection can be established when the employee proves that before the accident he was in good health, but commencing with the accident, symptoms of the disabling condition appeared, and there is sufficient medical evidence to show a reasonable possibility of a causal connection between the accident and the disabling condition. Id. However, an employee’s pre-existing condition does not disqualify his claim if the work-related in *1033 jury either aggravated or combined with the infirmity to produce the disability for which compensation is claimed. When the claimant proves that he had no disabling symptoms before the accident, but that commencing with the accident, the disabling symptoms appeared, and there is medical or circumstantial evidence indicating a reasonable possibility of a causal connection between the accident and the disabling condition, a claimant’s work injury is presumed to have aggravated a pre-exist-ing infirmity to produce his disability. Id.
Whether the claimant has carried his burden of proof and whether testimony is credible are questions of fact to be determined by the hearing officer. Harris v. Coushatta Industrial Sand, Inc., 31,977 (La.App.2d Cir.6/16/99), 741 So.2d 143. Factual findings in workers’ compensation cases are subject to the manifest error rule. Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129; Harris, supra. Under the manifest error rule, the reviewing court does not decide whether the factual findings are right or wrong, but whether they are reasonable. 9 Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880 (La.1993). Where there are two permissible views of the evidence, a factfinder’s choice between them can never be manifestly erroneous or clearly wrong. Stobart, supra. Thus, “if the [factfinder’s] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1112 (La.1990).
In this case we conclude that there were two permissible views of the evidence presented. The employer presented the testimony of three persons who claimed to have heard Mr. Hall say that his back problems commenced after he tripped and fell while feeding his dog. In addition, Hall’s doctor, Dr. Holman, believed that Hall had confirmed this story with him. The claimant flatly denied that these conversations took place and only admitted that he “almost fell” while feeding his dog due to the instability of his knee after the accident. In addition to his own testimony, the claimant presented testimony from his wife, neighbor and co-worker confirming that he had complaints of back pain shortly after the incident at work. The medical evidence concerning the causation of Hall’s back problem was equivocal and was based in large measure on the history given by Mr. Hall. Dr. Holman was of the opinion that it was unlikely that Hall’s back problems were caused by the October 16, 2001, accident, and Dr. Sadasivan believed that the work accident could have caused the back injury based on the history from Mr. Hall, the physical, and the treatment plan.
^CONCLUSION
With two permissible views of the evidence, one of which being that Hall injured his back at work, and the other being that he hurt himself while feeding his dog and not at work, we find no justification for reversal of the judgment of the OWC. In the absence of manifest error, the judgment of the OWC is affirmed at appellant’s cost.
AFFIRMED.
BROWN, C.J., dissents with written reasons.